# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HENRY GETER,                                :
                                            :
    Plaintiff,          :          Civil Action No.:          16-482 (RC)
                                            :
    v.                  :          Re Document No.:          55
                                            :
UNITED STATES GOVERNMENT                    :
PUBLISHING OFFICE,                          :
                                            :
    Defendant.          :

## MEMORANDUM OPINION

### GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

Plaintiff, Mr. Henry Geter, is a former employee of Defendant, the United States Government Publishing Office (GPO). This Court has previously resolved one employment-related lawsuit by Mr. Geter against the GPO. *See generally Geter v. Gov't Publ'g Office* (*Geter I*), No. 13-916, 2016 WL 3526909 (D.D.C. June 23, 2016). In the current case, Mr. Geter claims that the GPO failed to accommodate his disability and retaliated against him for engaging in protected activities. The GPO has now moved for summary judgment as to both claims. Because Mr. Geter has not advanced evidence from which a jury could reasonably find in his favor on either claim, the Court will grant the motion in full.

## II. BACKGROUND

Mr. Geter and the GPO have had a long and contentious relationship, not all of which is relevant to the pending motion. But because Mr. Geter claims here that he faced retaliation in part for filing a complaint in *Geter I*, it is worth reviewing the facts and procedural history of that case.

## A.  The Prior Case: *Geter I*

Mr. Geter began working at the GPO in 2002 and was eventually promoted to motor vehicle operator.  *See Geter I*, 2016 WL 3526909, at *2.  In that position, he was required to have a valid commercial driver's license (CDL) and the ability to lift loads of up to 50 pounds. *Id.*

In March of 2009, Mr. Geter injured his back at work and stopped working.  *Id.*  After some negotiations and disputes with the GPO (and medical evaluations by both a Department of Labor medical examiner and Mr. Geter's private physician), he eventually returned to work in August 2010.  *Id.* at *2–3.

The events giving rise to *Geter I* took place shortly after Mr. Geter's return to duty.  *See id.* at *3.  Without endorsing either side's version of events, the basic gist is that Mr. Geter was asked by his supervisor to drive a truck, even though Mr. Geter maintained that doing so would violate medical restrictions imposed in the wake of his 2009 injury.  *Id.*  But facing a skeptical boss, Mr. Geter ultimately complied and suffered (or at least claimed to have suffered) an injury as he was lifting himself into his vehicle.  *Id.* at *3–4.  Shortly thereafter, after refusing to drive due to his (claimed) injury, Mr. Geter was fired.  *Id.* at *4.  Based on these events, Mr. Geter sought counseling with the GPO's equal employment opportunity office, filed a formal complaint of discrimination that was ultimately dismissed by the Equal Employment Opportunity Commission (EEOC), and finally, on June 18, 2013, filed the *Geter I* complaint.  *Id.* at *4–5.

*Geter I* put forward a variety of claims, namely race and age discrimination, intentional infliction of mental harm, creation of a retaliatory hostile work environment, failure to accommodate, and retaliatory discrimination.  *See generally id*.  Many of these claims, this Court

ultimately found, were not viable because Mr. Geter had failed to exhaust the relevant administrative remedies. *See id.* at *6–7. As to those remaining, this Court found that Mr. Geter had failed to set forth evidence sufficient to survive summary judgment. *See id.* at *7–16.

## B. The Current Case

While *Geter I* was being litigated, the relationship between Mr. Geter and the GPO remained contentious. We take up the narrative in 2013. By that time, for reasons not relevant here, Mr. Geter had been terminated from his position at the GPO, but the Merit Systems Protection Board (MSPB) had ordered his reinstatement; he remained on a period of administrative leave. *See* Pl.'s Statement of Material Facts ("Pl.'s SOF") at 11–12, ECF No. 59; Def.'s Statement of Material Facts ("Def.'s SOF") at 4, ECF No. 55-2.[1]

### 1. The November 25 Meeting

In a November 21, 2013 letter, the GPO recalled Mr. Geter from leave and instructed him to report to work on November 25, "ready, willing and able to perform all of the duties and responsibilities of your position." Ltr. from G. Thomas to H. Geter (Nov. 21, 2013) at 2, ECF No. 55-14. The letter added that "you will need to bring with you when you report your valid commercial driver's license (CDL)." *Id.* Mr. Geter reported to work as instructed—though without a valid CDL. Pl.'s SOF at 13. As he explained to his supervisor, Mr. Gregory Robinson, he had not been able to obtain such a license due to continuing medical restrictions. *Id.*; *see also* Def.'s SOF at 4 ("Geter . . . claimed that he could not obtain a valid CDL because a doctor would not clear him."). He requested that Mr. Robinson transfer him "to a desk position until his doctor cleared him with no restrictions and he was able to obtain a CDL." Pl.'s SOF at

---

[1] Except where specifically noted, the facts recited here are uncontested by the parties. All page numbers refer to the ECF page numbers.

13; *see also* Def.'s SOF at 5 ("According to Geter, he also requested an accommodation during this meeting—specifically, a transfer to a desk position.").

According to the GPO, Mr. Robinson explained to Mr. Geter that there were no vacant positions and then—because Mr. Geter was lacking the CDL required for his actual position— sent him home to remain on administrative leave. Def.'s SOF at 5. According to Mr. Geter, however, Mr. Robinson did *not* tell him that there were no vacant positions; instead, Mr. Robinson informed him that "we aren't here to talk about your reasonable accommodation" before sending him home. Pl.'s SOF at 6.

### 2. The December 16 Letter

On December 16, the GPO sent Mr. Geter another letter. *See* Def.'s SOF at 5; Ltr. from G. Robinson to H. Geter (Dec. 16, 2013) ("Dec. 16 Letter"), ECF No. 55-19.

The letter began by acknowledging that Mr. Geter had returned to duty on November 25, though without a valid CDL. Dec. 16 Letter at 2. Under the apparent impression that Mr. Geter might be able to obtain a medical clearance and license in short order, it directed him to report to work by January 2, 2014, "ready and able to work with a valid CDL in your possession." *Id.* At the same time, it acknowledged Mr. Geter's injury and transfer request. *See id.* ("[I]n your return to duty meeting you alleged that you had suffered injury to your back and also that you would like to request a transfer. If it is in fact your desire to seek a reasonable accommodation, you need to inform me specifically what accommodation/s you are seeking."). It concluded with a warning:

> [I]f . . . you are not able to perform the functions of your position with your valid CDL, and you have not submitted a valid documented request for reasonable accommodation by . . . [January 2, 2014], I will be forced to propose your removal from Federal service for your inability to perform the essential functions of your position due to the loss of your CDL.

*Id.* at 3.

Mr. Geter maintains that he did not receive a copy of this letter. Pl.'s SOF at 8 ("Although Geter's elderly mother may have signed [for] the letter, the letter was not given to Mr. Geter.").

### 3. The December 23 Phone Call

On December 23, Mr. Geter called Mr. Robinson directly to discuss his return to duty. *Id.* at 14. Mr. Geter maintains that he renewed his request for an accommodation during this call, *see id.*, whereas the GPO claims that he did not, *see* Def.'s Response to Pl.'s Statement of Genuine Issues at 5, ECF No. 61-1. Specifically, the GPO relies on a memorandum drafted by Mr. Robinson a couple of weeks after the call:

> Mr. Geter inquired about the Request for Reasonable Accommodations. As I explained the process to him, Mr. Geter informed me that he was not going to apply for Reasonable Accommodations. I asked Mr. Geter if he was sure about this and he replied "I'm not going to put in for it; all I want is a chair". I replied "a chair". Mr. Geter said "a chair for my back". I informed him to contact his doctor and request for a chair.

Robinson Mem. (Jan. 8, 2014) at 2, ECF No. 55-20.

### 4. The January 3 Meeting

On January 3, 2014,[2] Mr. Geter again reported to Mr. Robinson for duty, still lacking a valid CDL. Def.'s SOF at 6. And again, Mr. Geter was sent home to stay on administrative leave. *See id.* According to Mr. Geter, he reiterated (now for the third time) his request for an accommodation at this meeting, but Mr. Robinson declined to respond. Pl.'s SOF at 9; *see also* Geter Aff. (Apr. 7, 2017) at 3, ECF No. 55-16 ("I told Mr. Robinson that I still had lifting

---

[2] Mr. Geter had reported as instructed on January 2, but was denied entrance to his building due to an "administrative oversight with building security." Proposal to Remove (Jan. 29, 2014) at 3, ECF No. 55-18. He then contacted Mr. Robinson and was instructed to report the next day. *Id.*

restrictions, could not return to full duty and could not obtain a CDL. . . . Mr. Robinson did not

respond to any of my reasonable accommodation requests.").

### 5. Removal

On January 16, Mr. Robinson initiated a proposal for Mr. Geter's removal; on January

29, the GPO sent Mr. Geter the formal proposal to remove. *See* Pl.'s SOF at 15; *see also* Def.'s

SOF at 7. The proposal cited as justification the "[f]ailure to possess a valid Commercial

Driver's License and . . . [the] failure to perform the essential functions of your position."

Proposal to Remove (Jan. 29, 2014) at 2, ECF No. 55-18. Mr. Geter objected to the proposed

removal on March 10, but the GPO ultimately decided to accept the proposal on April 10. *See*

Def.'s SOF at 7–8. Consistent with the proposed removal, the final removal decision charged

that "[y]our actions have prohibited you from performing the essential functions of your position

because you do not possess a valid Commercial Driver's License." Removal Decision (Apr. 10,

2014) at 3, ECF No. 55-26. Mr. Geter challenged his removal administratively, but the MSPB

and EEOC both affirmed the GPO's decision. *See* Final Order of MSPB (July 15, 2015), ECF

No. 16-7; Decision of EEOC (Feb. 10, 2016), ECF No. 16-8.

### 6. Filing and Subsequent Procedural History

After the unfavorable EEOC decision, Mr. Geter brought this action. His initial

complaint alleged discrimination claims under Title VII of the Civil Rights Act of 1964,

retaliation and failure to accommodate claims under Title VII and the Rehabilitation Act, and

failure to accommodate claims under the Americans with Disabilities Act (ADA). *See generally*

Compl., ECF No. 1. Mr. Geter subsequently amended his complaint to allege violations of the

Rehabilitation Act and Title VII instead of ADA claims. *See generally* Am. Compl., ECF No. 3.

At this point, the GPO moved for the Court to either dismiss the case or grant summary judgment. *See Geter v. United States Gov't Publ'g Office* (*Geter II*), 268 F. Supp. 3d 34, 39 (D.D.C. 2017). As a technical matter, the GPO argued in part that the claims should have been brought under the ADA; more substantively, it argued that the claims were barred by the doctrine of claim preclusion (based on *Geter I*). *See generally* Def.'s Mot. Dismiss or Mot. Summ. J., ECF No. 15. For his part, Mr. Geter sought leave to amend a second time in order to clarify that his claims were actually ADA claims. *See Geter II*, 268 F. Supp. 3d at 39. Ruling on these motions, this Court found that claim preclusion did not bar Mr. Geter's proposed claims and granted him leave to file another complaint. *See id.* at 40. That amended complaint—the operative complaint here—solely brought failure to accommodate and retaliation claims under the ADA.[3] *See* Second Am. Compl. at 9, ECF No. 40. After discovery closed, the GPO brought the pending motion for summary judgment.

### III. LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), while a dispute is "genuine" if there is enough evidence for a reasonable finder of fact to decide in favor of the non-movant, *see Scott v. Harris*, 550 U.S. 372, 380 (2007).

In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir.

---

[3] As the parties now agree, the ADA—not the Rehabilitation Act—is the proper vehicle for discrimination claims brought by GPO employees against their employer. *See Geter II*, 268 F. Supp. 3d at 7 n.11.

2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant, *see Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). And because the nonmovant's evidence must allow a reasonable jury to find in its favor, "merely colorable" or "not significantly probative" evidence will not preclude summary judgment. *Potter v. District of Columbia*, 558 F.3d 542, 549 (D.C. Cir. 2009) (quoting *Anderson*, 477 U.S. at 249–50).

## IV. ANALYSIS

### A. Failure to Accommodate

Mr. Geter's basic argument is that the GPO violated its duty to accommodate by ignoring his repeated requests (on November 23, December 23, and January 3) for a temporary reassignment to a desk position. *See* Pl.'s Mem. in Support of Opp'n Mot. Summ. J. at 9 ("Pl.'s Opp'n Mot. Summ. J."), ECF No. 58-1. For its part, the GPO maintains that Mr. Geter failed his obligations under the ADA to adequately engage in the accommodation process and to demonstrate that there was an available desk job to which he could be reassigned. *See* Def.'s Mem. in Support of Mot. Summ. J. at 19, ECF No. 55-1.

#### 1. Legal Framework

Under the ADA, a covered employer discriminates when it fails to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). A "reasonable accommodation" can include a variety of actions by the employer, including "reassignment to a vacant position." *Id.* § 12111(9)(B). However, as our Circuit has explained, an employee is not automatically entitled to reassignment. Most fundamentally, "[a]n employee need not be reassigned if no vacant

position exists"—that is, "employers are not required . . . to create a new position" in order to accommodate an employee. *Aka v. Washington Hosp. Ctr.,* 156 F.3d 1284, 1305 (D.C. Cir. 1998) (internal citations omitted); *see also U.S. Equal Emp't Opportunity Comm'n, No. 915.002, Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act* (Oct. 17, 2002), 2002 WL 31994335, at *21 ("The employer does not have to bump an employee from a job in order to create a vacancy; nor does it have to create a new position."). Relatedly, "[r]easonable accommodation does not require an employer to restructure an existing job to remove some of its essential functions." *Jones v. Univ. of D.C.*, 505 F. Supp. 2d 78, 90 (D.D.C. 2007).

At the same time, employers are not completely off the hook: they have a duty to help identify suitable vacancies as part of the overall accommodation process. *See Aka*, 156 F.3d at 1304 n.27 (noting that the employer "had a corresponding obligation to help him identify appropriate job vacancies (since plaintiffs can hardly be expected to hire detectives to look for vacancies)").

Generally speaking, then, "an employee's obligation to seek reassignment and the employer's obligation to assist or consider reassignment must be weighed against each other based on the circumstances of each case." *Ward v. District of Columbia*, 211 F. Supp. 3d 58, 68 (D.D.C. 2016). But once a case reaches litigation,[4] it falls to the plaintiff to "demonstrate that there existed some vacant position to which he [or she] could have been reassigned." *Aka*, 156 F.3d at 1304 n.27 (internal citations omitted); *see also Faison v. Vance-Cooks*, 896 F. Supp. 2d

_____

[4] *See Jackan v. New York State Dep't of Labor*, 205 F.3d 562, 568 n.4 (2d Cir. 2000) ("The question whether an employer bears a legal duty to assist an employee in identifying appropriate vacant positions in the immediate aftermath of a request for reasonable accommodation is analytically distinct from the question of which party bears the burden of persuasion on the existence of a vacancy in litigation.").

37, 60 (D.D.C. 2012) ("[I]t is the plaintiff's burden to identify available positions and to demonstrate that she was qualified for those positions." (citations omitted)).

## 2. Analysis

Here, the parties agree that there were no formal or official vacancies—no agency job posting or the like. *Compare Aka*, 156 F.3d at 1286–87 (discussing defendant's job postings and plaintiff's applications to various vacant positions). But Mr. Geter argues that it is sufficient that there were *de facto* vacancies, regularly created by Mr. Robinson "regardless of whether there was an official 'vacancy.'" Pl.'s Opp'n Mot. Summ. J. at 12. There is undeniably strong evidence for such a practice at the GPO. Mr. Robinson himself stated that certain "employees were accommodated by me, Gregory Robinson, assisting primarily with clerical duties," even though "[t]here were no vacant positions that were filled and no temporary positions created for these employees." Robinson Decl. at 1, ECF No. 58-13. And at least one employee confirmed, via affidavit, that other employees were reassigned by Mr. Robinson to "light duty" or "office work" when they were injured. *See* Pl.'s Opp'n Mot. Summ. J. at 14 (citing Arthur Aff. at 1, ECF No. 58-12).

The key question, then, is whether Mr. Geter can carry his burden of identifying a vacancy by pointing to the GPO's past practice of creating temporary positions. Mr. Geter does not cite specific authority on this point, but seems to rely on the general principle that "the touchstone of the reassignment inquiry is 'reasonableness.'" *Alston v. Washington Metro. Area Transit Auth.*, 571 F. Supp. 2d 77, 84 (D.D.C. 2008) (quoting *Smith v. Midland Brake, Inc., a Div. of Echlin, Inc.*, 180 F.3d 1154, 1171 (10th Cir. 1999)). That general statement is correct, but it does not necessarily resolve the question here, especially in light of the specific and

clearly-settled rule that an employer is under no obligation to create a new position for an employee. *See Aka*, F.3d 1284 at 1305.

Some existing authority suggests that the idea of implied or presumptive vacancy is a nonstarter. Generally, our Circuit has explained that "[t]he word 'vacant' has no 'specialized meaning' in the ADA." *McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, 611 F.3d 1, 5 (D.C. Cir. 2010) (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 399 (2002)). As a result, its meaning in ordinary English is simply "not held, filled, or occupied, as a position or office." *Id.* (quoting Webster's New Twentieth Century Dictionary 2014 (2d ed. 1983)). Against this straightforward, formalistic definition, it is difficult to see room for Mr. Geter's constructive approach. And at least one other Circuit agrees that "vacant" means formally empty, that is, open for application. *See Duvall v. Georgia-Pac. Consumer Prod., L.P.*, 607 F.3d 1255, 1264 (10th Cir. 2010) ("[A] position is 'vacant' for the purposes of the ADA's reassignment duty when that position would have been available for similarly-situated nondisabled employees to apply for and obtain."). Here, in contrast, there is no indication that a nondisabled GPO employee would be able to apply for the kind of desk position contemplated by Mr. Geter. Finally, additional support for GPO's position comes from *Lester v. Natsios*, 290 F. Supp. 2d 11 (D.D.C. 2003). There, "[p]laintiff's proffer of the identity of one individual who received a transfer" was not enough to "satisf[y] her burden of establishing that other positions were available." *Id.* at 2.

There are, however, cases that tilt the other way. In a case from this District, Judge Kennedy characterized the test more generally as "whether reassignment is 'reasonably available under the employer's existing policies,'" which in turn could be established by showing that the employer "has accommodated an employee in a similar situation." *Johnson v. Brown*, 26 F.

Supp. 2d 147, 152 (D.D.C. 1998) (quoting *Woodman v. Runyon*, 132 F.3d 1330, 1346 (10th Cir. 1997)).  Exactly what is meant by "reasonably available under the employer's existing policies" is not completely clear; indeed, it seems to reframe the same basic issue in different terms.  That is, the phrase could encompass a *de facto* policy of reassignment, which would favor Mr. Geter, or it could be limited to a written reassignment policy or formal vacancies, which would not.  But it is significant that, in *Johnson*, it appears there *was* an available light duty assignment that was ultimately awarded to a different employee.  *See id.* ("Drawing all justifiable inferences in favor of the plaintiff, a reasonable fact finder could conclude that the Medical Center terminated Johnson so that another employee, slightly less disabled than Johnson, could work in the light duty assignment in the pack room.").  One out-of-circuit case supports Mr. Geter's position more directly: there, it was enough that, based on other reassignments, "a factfinder could conclude that [the employer] does have the ability to find new, less strenuous positions for disabled workers."  *Howell v. Michelin Tire Corp.*, 860 F. Supp. 1488, 1493 (M.D. Ala. 1994); *see also id.* (characterizing a prior reassignment as "evidence of the company's ability to accommodate workers without relying on specific vacancies").  This suggests that the proper inquiry concerns the employer's capacity to create a new vacancy—rather than existence of the vacancy itself.

Ultimately, in the absence of stronger authority, the Court is hesitant to recognize an implied vacancy rule.  As noted, the statutory language—"reassignment to a vacant position"— suggests that the vacancy must actually exist.  42 U.S.C. § 12111(9)(B).  And deciding otherwise would create tension with the settled rule that employers do not have to create new positions in order to facilitate reassignment.  *See Aka*, 156 F.3d at 1305.  It would also sit uncomfortably with the proposition that "[r]easonable accommodation does not require an employer to restructure an existing job to remove some of its essential functions"—essentially what Mr. Geter is requesting

here.  *Jones*, 505 F. Supp. 2d at 90; *see also Hancock v. Washington Hosp. Ctr.*, 13 F. Supp. 3d 1, 6 (D.D.C. 2014), *aff'd*, 618 F. App'x 4 (D.C. Cir. 2015) ("[A]n accommodation that eliminates an essential function of a job is unreasonable under the ADA, even if the employer voluntarily provided such an accommodation in the past.").  And it would also create difficult line-drawing problems—what amount of prior reassignment is enough to create a *de facto* vacancy?

Thus, regardless of GPO's past practice as to other employees, it was not the GPO's obligation to create a new position for Mr. Geter.  And because Mr. Geter cannot otherwise meet his burden of establishing the existence of a suitable vacancy, his reasonable accommodation claim fails.  That said, the failure to reassign Mr. Geter to temporary desk work—when other employees were so accommodated—might animate a retaliation claim, as the Court discusses below, or even other kinds of claims not raised here.[5]

**B.  Retaliation**

Mr. Geter claims that he was fired in retaliation for engaging in at least one of three kinds of protected activities: (1) "making requests for reasonable accommodations," (2) "pursuing EEO complaints," and (3) "filing a lawsuit in [*Geter I* ]."  Second Am. Compl. at 9.  In his briefing here, he makes no mention of the EEO complaints, but focuses on the three

---

[5] For example, Mr. Geter may have also had an argument that the GPO failed its "obligation to help him identify appropriate job vacancies."  *Aka*, 156 F.3d at 1304 n.27.  But that question—and how it might relate to the underlying ADA claim—was not briefed and the Court declines to address it here.  Also possible—but again not presented—would be a discrimination claim, if it were alleged that the GPO selectively provided reassignment on an impermissible basis.  *See, e.g., Dorchy v. Washington Metro. Area Transit Auth.*, 45 F. Supp. 2d 5, 18 (D.D.C. 1999) (denying summary judgment on a Title VII claim where "other non-minority employees were placed in positions that permitted them to work, notwithstanding their injuries" and defendant's "only explanation for not modifying [plaintiff's] job duties or offering him a different job was that it did not have a light-duty program in which to place [him]").

accommodation requests (made in November 2013, December 2013, and January 2014) and the filing of the *Geter I* complaint (filed on June 18, 2013). *See* Pl.'s Opp'n Mot. Summ. J. at 22.

1. Legal Framework

The ADA prohibits employers from retaliating against employees who engage in activity protected under the statute. *See* 42 U.S.C. § 12203(a). ADA retaliation claims are analyzed under the familiar *McDonnell Douglas* burden-shifting framework. *See Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005).

Under this framework, a plaintiff must first establish the prima facie elements: that he or she engaged in a protected activity, that her or she was subjected to an adverse action by the employer, and that there was a causal link between the two. *See id.* If a plaintiff makes such a showing, then the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for its decision. *See id.* (quoting *Jones v. Wash. Metro. Area Transit Auth.*, 205 F.3d 428, 433 (D.C. Cir. 2000)). Once the employer has done so, "the central question at the summary judgment stage becomes whether the employee has 'produced sufficient evidence for a reasonable jury to find that the employer's asserted non-retaliatory reason was not the actual reason' and that the employer fired the employee as retaliation." *Johnson v. Interstate Mgmt. Co., LLC*, 849 F.3d 1093, 1099 (D.C. Cir. 2017) (quoting *Hernandez v. Pritzker*, 741 F.3d 129, 133 (D.C. Cir. 2013)); *see also Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008) ("[W]here an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*.").

To "support an inference that the employer's stated reasons were pretextual, and the real reasons were prohibited discrimination or retaliation," a plaintiff can rely on a variety of evidence, including "the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (citing *Brady*, 520 F.3d at 495 & n.3).

## 2. Analysis

Here, the GPO has offered a legitimate and non-retaliatory reason for Mr. Geter's termination: that he lacked the CDL required for his position. *See* Removal Decision (Apr. 10, 2014) at 1-2. For his part, Mr. Geter does not contest that he lacked a valid CDL, or that a CDL was a required for his role. *See* Pl.'s SOF at 6 ("Geter had a valid driver's license, but his CDL had expired."); *id.* at 10 ("Maintaining a valid CDL is a requirement to drive a commercial vehicle at GPO."). Instead, Mr. Geter argues that the GPO pretextually seized upon his lack of a CDL as "an opportunity to rid itself of a complaining employee." *Id.* at 11. The question, then, is whether there is enough evidence for a jury to disbelieve the GPO's stated rationale and infer an illicit retaliatory motive.

Mr. Geter first argues that the timing of Mr. Geter's dismissal suggests pretext. As he points out, very shortly after Mr. Geter made his multiple requests for reassignment (on November 25, December 23, and January 3), Mr. Robinson made the initial recommendation for Mr. Geter's removal. *See* Recommendation for Corrective Action (Jan. 16, 2014), ECF No. 58-16. Speaking in terms of his prima facie case, Mr. Geter argues that "[t]his close temporal

proximity satisfies causal connection for the purposes of a motion for summary judgment."  Pl.'s Opp'n Mot. Summ. J. at 24.

However, our Circuit has recently warned against inferring retaliation from timing alone, at least at the summary judgment stage when the defendant has proffered a non-retaliatory explanation:

> Mere temporal proximity is not sufficient to [defeat the proffer and support a finding of retaliation], because otherwise "protected activities would effectively grant employees a period of immunity, during which no act, however egregious, would support summary judgment for the employer in a subsequent retaliation claim."  As a result, "positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations [for the adverse employment action] are genuine."

*Iyoha v. Architect of the Capitol*, 927 F.3d 561, 574 (D.C. Cir. 2019) (quoting *Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007)).  Applied here, *Iyoha* makes clear that the timing of Mr. Geter's firing, without more, is not enough to defeat summary judgment.

Resisting this conclusion, Mr. Geter maintains that "[o]ne way of demonstrating a causal connection is 'by showing a close temporal proximity between the employee's protected conduct and the adverse employment action taken by the employe[r].'"  Pl.'s Opp'n Mot. Summ. J. at 23 (quoting *Badwal v. Bd. of Trustees of Univ. of D.C.*, 139 F. Supp. 3d 295, 318 (D.D.C. 2015)). But *Badwal* was discussing the plaintiff's prima facie case in the context of a motion to dismiss. *See* 139 F. Supp. 3d at 318.  *Iyoha* implies a higher standard.  *See* 927 F.3d at 574 ("[E]ven if we were to adopt Iyoha's interpretation of the relevant dates and find that he has established a prima facie case for retaliation using evidence of temporal proximity, there would still be insufficient evidence to defeat summary judgment.").

Perhaps anticipating that timing alone would not carry the day, Mr. Geter offers two "non-temporal factor[s]" that suggest a causal link between his protected activities and his firing.

Pl.'s Opp'n Mot. Summ. J. at 24. As a one non-temporal factor, Mr. Geter highlights "the manner in which [he] was terminated." *Id.* Mr. Geter's argument here is not very clear; he suggests, without elaboration, that his dismissal violated his "notice due process rights." *Id.* at 24. But Mr. Geter does not develop this analysis any further; in any case, the record suggests Mr. Geter was given ample notice of his need to acquire a CDL and of his proposed termination. *See, e.g.*, Ltr. from G. Thomas to H. Geter (Nov. 21, 2013) at 2; Proposal to Remove (Jan. 29, 2014) at 2. Mr. Geter also challenges a single statement in the GPO's final removal decision: the observation that Mr. Geter was required to "possess a CDL and a valid state license" as part of his duties. Removal Decision (Apr. 10, 2014) at 2. In fact, as Mr. Geter points out, federal regulations prohibit a commercial vehicle driver from possessing more than one driver's license at once. *See* 49 C.F.R. § 383.21 ("No person who operates a commercial motor vehicle shall at any time have more than one driver's license."). Thus, Mr. Geter suggests, the GPO's final decision improperly implied that he was required to maintain two separate licenses—and thereby violate federal law—in order to maintain his position. Pl.'s Opp'n Mot. Summ J. at 24. The Court is not convinced that this is a fair reading of the GPO's language. In any case, no reasonable juror could infer retaliatory animus from this single imprecise reference. The GPO's rationale for firing—the lack of a CDL—was consistently articulated throughout the removal process; nothing suggests that the GPO was firing Mr. Geter for refusing to violate federal law.

As a separate non-temporal factor, Mr. Geter points to the GPO's "repeated denial of his requests for reasonable accommodations." *Id.* Specifically, he suggests that the GPO's steadfast refusal to accommodate Mr. Geter—in contrast to its willingness to provide temporary assignments to others—supports an inference of retaliation. *See id.* ("Defendant had previously accommodated other CDL drivers with desk positions; sometimes for periods as long as eighteen

months.").  The GPO responds that, technically, it did not deny his requests, but simply asked him to support his request with documentation.  Def.'s Reply Pl.'s Opp'n Mot. Summ. J. at 12. It also argues that, as a matter of logic, it cannot be that "an inference of retaliation is created" whenever "a federal agency denies a request for an accommodation."  *Id.*

But of course, Mr. Geter is not suggesting that every denial of an accommodation request automatically creates an inference of retaliation.  Rather, his point is that his unequal treatment— essentially, having every request for a temporary desk assignment met with delay, obfuscation, or a request for further documentation, while others similarly situated were accommodated without question—could suggest to a jury that the GPO was acting with a retaliatory motive.[6] *See, e.g.*, Pl.'s SOF at 8 ("Mr. Geter was sent home because the Agency planned on terminating his employment as opposed to accommodating him as other similarly situated drivers had been accommodated. The difference of course, being, Mr. Geter had filed a federal district court lawsuit alleging Title VII and ADA violations and an MSPB litigation making similar complaints.").

To substantiate such a theory, however, Mr. Geter needs to identify employees, otherwise similarly situated, who had not engaged in protected activities but were, in fact, accommodated. That would then permit the inference that Mr. Geter was singled out because of his accommodation requests,[7] his EEO complaints, or his discrimination lawsuit in *Geter I*.  *See Walker*, 798 F.3d at 1092 (noting that an inference of pretext could follow from "the employer's

---

[6] Note that this theory could survive even if no one was legally entitled to accommodation or reassignment.  *Cf. supra* n.5 (suggesting that selectively providing reassignment on an impermissible basis—even if reassignment was not required under the ADA—could constitute a discrimination claim).

[7] To be clear, the argument here would be that the accommodation requests themselves triggered retaliation.  That, in turn, would require identifying comparators who were accommodated on light duty without even making an accommodation request.

better treatment of similarly situated employees outside the plaintiff's protected group").  And in this Circuit, in order for a plaintiff to establish that a comparator is similarly situated, he or she must establish that the comparator is nearly identical in all relevant respects.  *See Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 548 F.3d 137, 145 (D.C. Cir. 2008) (concluding that plaintiff had failed to show that "all of the relevant aspects of [his] employment were nearly identical to those of [his comparator]" (quoting *Neuren v. Adduci, Mastriani, Meeks & Schill,* 43 F.3d 1507, 1514 (D.C. Cir. 1995) (internal quotation marks and citation omitted))).

In support of such a comparator theory, Mr. Geter's brief cites the affidavit of Sammie Arthur, a GPO employee who worked as a clerk in the delivery section from 1996 until 2011.  Pl.'s Opp'n Mot. Summ. J. at 24 (citing Arthur Aff.).  Mr. Arthur in turn names "two CDL drivers, Brandon Debrew and Monique [Jones], that were injured on or off the job" and "were given light duty office work" for approximately 18 months and 6 months, respectively.  Arthur Aff. at 1.  But Mr. Arthur does not specify whether Mr. Debrew and Ms. Jones had or had not engaged in protected activities (whether requesting an accommodation, making EEO complaints, or filing lawsuits), which undercuts their value as comparators.[8]  *See generally id.*

Similarly, in his statement of material facts, Mr. Geter cites additional employee declarations to show that other employees were treated more favorably, but neither Mr. Geter nor the statements themselves provide much clarity on the activities of the proposed comparators. *See* Pl.'s SOF at 13–14 ("Mr. Robinson has previously created positions for drivers and transferred them to such positions when drivers request reasonable accommodations and/or are without a CDL." (citing, in addition to Mr. Arthur's affidavit, Graham Aff., ECF No. 58-11,

---

[8] Of course, it is likely that both actually requested accommodations.  But the point is that, without knowing exactly what protected activities they did or not undertake, it is difficult for the Court to evaluate their value as comparators.

Robinson Decl., ECF No. 58-13, and Mielke Decl., ECF No. 58-14)). For example, Bobby Graham explained that he was a motor vehicle operator who lost his CDL when he was prescribed insulin, but was "permitted . . . [by Mr. Robinson] to work on the loading dock (not driving)." Graham Aff. at 1. Missing here are details indicating whether Mr. Graham actually requested an accommodation or engaged in other protected activities.[9] Mr. Graham also identified "[a]nother employee, Rober[t] Courtney, [who] didn't re-certify his CDL and was permitted to continue working in the section (not driving trucks) for approximately seven months." *Id.* at 2. Again, there are no details regarding Mr. Courtney's engagement in any protected activities. Similarly, the declaration by Dan Mielke—the GPO's Chief Human Capital Officer—does not refer to any particular accommodations or reassignments, but states only that there were no vacant positions in the delivery section office or mail and messenger center. Mielke Decl. at 1.

Perhaps the most information about potential comparators comes from Mr. Robinson's own declaration. He names "[f]our Delivery Sections employees; Monique Jones, Robert Courtney, Bobby Graham, and Marvin Jones [who] have been accommodated between 2010 and 2018 in administrative or clerical positions." Robinson Decl. at 1. He notes that each of the four had filed an EEO complaint. *Id.* at 2. He also states that "Monique Jones accepted a downgrade to a Supply Technician position . . . after engaging in the interactive reasonable accommodation process," that "Robert Courtney was reassigned to the Warehouse Division," and that both Bobby Graham and Marvin Jones were "accommodated." *Id.* at 1. The declaration includes a

_____

[9] Mr. Graham likely alludes to an actual accommodation request when he explains that "[w]hen I worked on the loading dock I gave my doctor's slips directly to Mr. Robinson." Graham Aff. at 2. But he does not provide further details.

"U.S. Government Publishing Office Reasonable Accommodation Decision Form" indicating that Marvin Jones's accommodation request had been approved. *Id.* at 3–4.

Considering the proffered evidence as a whole, the Court does not perceive a sufficient basis for inferring a retaliatory motive. If anything, that Mr. Geter's coworkers were accommodated—even after, in some cases, engaging in protected activities like requesting accommodations and filing EEO complaints—undercuts rather supports a retaliatory theory. That is, that other employees in a protected group analogous to Mr. Geter's were treated well suggests that his protected activities were not the reason for his firing here. *Compare Walker*, 798 F.3d at 1092 (noting that an inference of pretext could arise from "the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff"). Mr. Geter's best argument is that the relevant "difference" was that the others had not specifically filed "a federal district court lawsuit alleging Title VII and ADA violations and an MSPB litigation making similar complaints." Pl.'s SOF at 8. But the record is actually silent in that regard; it is possible that some of the proposed comparators pursued litigation, but the Court simply cannot tell from the record presented.[10] And Mr. Geter has had ample time to pursue discovery to develop such a record if such evidence exists.

Ultimately, given that it is the plaintiff's burden to provide support for an inference of pretext (in this case, by identifying otherwise similarly situated employees who are not in the

---

[10] One could imagine further distinctions—for example, that the relevant difference was that Mr. Geter had filed multiple EEO complaints, while the other accommodated employees had filed fewer. But at a certain point, the potential distinctions become less and less suggestive of a hidden retaliatory motive, and it is not clear that those factual distinctions would allow the necessary inference. *See Walker*, 798 F.3d at 1092 ("Whether evidence offered to show that an employer's explanation is false itself suffices to raise an inference of unlawful discrimination or retaliation is a fact-sensitive inquiry."). In any case, Mr. Geter has not advanced this particular argument or identified the necessary comparators.

protected class who were treated more favorably), the Court concludes that no reasonable juror could infer a retaliatory motive from the comparative treatment of Mr. Geter's coworkers.

## V.  CONCLUSION

For the foregoing reasons, the Defendant's motion for summary judgment is **GRANTED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  January 31, 2020                                RUDOLPH CONTRERAS
                                                        United States District Judge